UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

In re

JOHN SUAREZ a/k/a JOHN MALDONADO,

        Debtor

--------------------------------------------------------------x

PEOPLE OF THE STATE OF NEW YORK, by
ELIOT SPITZER, Attorney General of the
State of New York,

        Plaintiffs,

    -against-

JOHN SUAREZ a/k/a JOHN MALDONADO,

        Defendant

--------------------------------------------------------------x

Chapter 7

Case No. 05-16137-ess

Adv. Pro. No. 05-1303-ess

## MEMORANDUM DECISION AWARDING
## JUDGMENT IN FAVOR OF THE PLAINTIFFS

*Appearances*:

Lois M. Booker-Williams, Esq.
Assistant Attorney General In Charge
Brooklyn Regional Office
55 Hanson Place, Suite 1080
Brooklyn, NY 11217
For the Plaintiff

Leon J. Quintero, Esq.
305 Broadway, Suite 500
New York, NY 10007
For the Debtor/Defendant

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding was commenced by the filing of a complaint (the "Complaint") by the People of the State of New York by the Attorney General of the State of New York (the "Plaintiffs") against John Suarez a/k/a John Maldonado, the debtor in the above-captioned Chapter 7 case (the "Debtor"). By their Complaint, the Plaintiffs seek a declaration that certain debts owed by the Debtor individually and as president of Core Health & Fitness, Inc. ("Core Heath & Fitness") arising from a Consent Order and Judgment entered by New York State Supreme Court on March 1, 2005 (the "Consent Order and Judgment"), are nondischargeable under Sections 523(a)(2)(A), 523(a)(4), 523(a)(7), and 523(a)(17) of Title 11 of the United States Code (the "Bankruptcy Code"). Plaintiffs also seek a declaration under 28 U.S.C. § 2201(a) that their enforcement of the Consent Order and Judgment does not violate the automatic stay pursuant to Section 362(b)(4).

A trial was held on October 13, 2006, and October 18, 2006, at which counsel for the Plaintiff and counsel for the Debtor appeared and were heard and testimony was taken. The Debtor moved for a directed verdict at the close of the Plaintiffs' case, and that motion was denied. The trial record was closed and the matter was submitted for decision on October 18, 2006.

Based on the entire record, including the testimony and exhibits and the arguments of counsel, and for the reasons set forth below, the Court concludes that the Debtor's obligation for restitution in the amount of $140,000 arising from the Consent Order and Judgment (the "Consent Judgment Debt") is nondischargeable under Section 523(a)(4) of the Bankruptcy Code.

**Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b).  This is a core

proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I).  The following are the Court's findings of fact

and conclusions of law after a trial pursuant to Rule 52 of the Federal Rules of Civil Procedure,

as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**Background**

A.    Procedural History

The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code

on April 20, 2005.  He seeks a discharge of, among other debts, a debt arising from the Consent

Order and Judgment entered in an action brought by the Plaintiffs in New York State Supreme

Court (the "State Court Action") to enjoin the Debtor and Core Health & Fitness "from engaging

in deceptive, fraudulent and illegal practices in connection with their health club business; to

obtain restitution and damages for consumers victimized by these practices; and to obtain civil

penalties and costs authorized by statute."  Complaint, Exh. B (Verified Petition in the State

Court Action) ¶ 1.

The Plaintiffs filed this Complaint, which states three causes of action, on July 29, 2005.

*See* Complaint ¶¶ 16-29, Adv. Pro. Docket 1.  By the first cause of action (the "First Cause of

Action"), the Plaintiffs seek a declaration that the Consent Judgment Debt is a debt obtained by

false pretenses, false representations, or actual fraud, and is excepted from discharge under

Section 523(a)(2)(A) of the Bankruptcy Code.  *See* Complaint ¶¶ 17-20.  By the second cause of

action (the "Second Cause of Action"), the Plaintiffs seek a declaration that the Consent

Judgment Debt is a debt arising from fraud or defalcation while the Debtor acted in a fiduciary

capacity, embezzlement, or larceny, and is excepted from discharge under Section 523(a)(4) of the Bankruptcy Code. *See* Complaint ¶¶ 22-23. By the third cause of action (the "Third Cause of Action"), the Plaintiffs seek a declaration that civil penalties of $30,000 and administrative costs of $2,000 owed by the Debtor to the State of New York are excepted from discharge under Sections 523(a)(7) and 523(a)(17) of the Bankruptcy Code. *See* Complaint ¶¶ 25-29.

The Debtor filed an answer to the Complaint on August 22, 2005, and denies the allegations supporting the Plaintiffs' claims of nondischargeability of the $140,000 restitution debt, the $30,000 civil penalties debt, and the $2,000 administrative costs debt, and requests that the relief sought by the Plaintiffs be denied in all respects. *See* Answer ¶¶ 1-29, Adv. Pro. Docket 6.

By stipulation and order entered by the Court on June 6, 2006, the parties agreed, and the Court ordered, that the civil penalties and administrative costs set forth in the Third Cause of Action are nondischargeable under Sections 523(a)(7) and 523(a)(17) of the Bankruptcy Code. *See* Stipulation and Order, Adv. Pro. Docket 21. Therefore, there remain for decision the Plaintiffs' First and Second Causes of Action, and the question of whether the Consent Judgment Debt is excepted from discharge under Section 523(a)(2)(A) or Section 523(a)(4) of the Bankruptcy Code.

The parties filed a joint pre-trial statement (the "Joint Pre-Trial Statement") on June 7, 2006. Adv. Pro. Docket 20. The parties filed pre-trial memoranda of law and the Plaintiffs filed a witness list on October 6, 2006. Adv. Pro. Docket 25 (Plaintiffs' Pre-Trial Memorandum of Law), 26 (Witness List), 28 (Defendant's Pre-Trial Memorandum of Law). As indicated above, this matter was tried by the Court on October 13, 2006, and October 18, 2006.

B.    Factual Background

*Core Health & Fitness*

As reflected in the Joint Pre-Trial Statement, the parties do not dispute the following facts.  The Debtor sought to open Core Health & Fitness as a health club facility in Brooklyn, New York.  Joint Pre-Trial Statement at 2.  The business was incorporated as Core Health & Fitness, Inc., on or about March 19, 2003.  *Id.*  The Debtor was the sole shareholder and president of Core Health & Fitness, and he alone was authorized to sign checks drawn on the Core Health & Fitness business account at Citibank, N.A. ("Citibank" and the "Citibank Account").  *Id.*  The Debtor obtained an employer identification number for Core Health & Fitness from the Internal Revenue Service, and attempted to lease space for the Core Health & Fitness facility at 102 North 6th Street in Brooklyn, New York (the "Premises").  Joint Pre-Trial Statement at 2-3.

The Debtor advertised Core Health & Fitness in the neighborhood using mailings, e-mail messages, and handbills.  Joint Pre-Trial Statement at 3; Plaintiffs' Exh. G (e-mail dated April 28, 2004; e-mail dated May 11, 2004).  From April 2004 to August 2004, Core Health & Fitness sold some 960 one-year prepaid memberships for $157 and $170 each, totaling $140,000.  Joint Pre-Trial Statement at 3.  The membership fees collected included application fees and sales taxes.  *Id.*  The Core Health & Fitness Membership Agreement provides for an automatic renewal program.  *Id.*  The Debtor deposited the Core Health & Fitness fees collected from consumers into the Citibank Account, and used that account to pay for construction expenses, equipment costs, employee salaries, marketing and promotional fees, attorney fees, and other expenses associated with establishing the business.  *Id.*

-4-

Core Health & Fitness was first scheduled to open for business on June 1, 2004, but the opening was delayed. *Id*. In August 2004, Core Health & Fitness opened for two weeks, but provided only limited services. *Id*. When it closed after that brief period of operation, consumers were left with unexpired memberships. *Id*. The Debtor did not deposit the fees collected from consumers in a segregated or escrow account. *Id*. Nor did the Debtor post a bond, letter of credit, or certificate of deposit with the New York Secretary of State. *Id*. The Debtor made refunds to only a few of the consumers holding unexpired memberships, and the great majority of consumers received neither the services purchased nor a refund of their membership fees. *Id*.

*The State Court Action*

The Plaintiffs began an investigation into the Debtor's business practices in early September 2004, less than a month after Core Health & Fitness closed its doors. *See* Complaint ¶ 6. On October 27, 2004, the Plaintiffs commenced the State Court Action against the Debtor and Core Health & Fitness seeking injunctive relief, restitution for the injured consumers, civil penalties, and statutory costs. Complaint ¶ 9, Exh. B (Verified Petition in State Court Action).

The Debtor, Core Health & Fitness, and the Plaintiffs reached a settlement in the State Court Action, and on February 28, 2005, the Debtor signed a Stipulation and Consent on behalf of himself and Core Health & Fitness. Plaintiffs' Exh. A (Consent Order and Judgment). On March 1, 2005, the New York State Supreme Court entered the Consent Order and Judgment in favor of the Plaintiffs and against the Debtor and Core. *Id*. The Debtor and Core Health & Fitness were represented by counsel in the State Court Action. *Id*.

The Consent Order and Judgment requires the Debtor and Core Health & Fitness to make

restitution of $140,000 (as defined above, the "Consent Judgment Debt"),[1] and to pay a civil penalty of $30,000 and statutory costs of $2,000. *Id.* The Consent Order and Judgment also permanently enjoins the Debtor and Core Health & Fitness "from participating or engaging in any manner in the operation of any health club in the State of New York, and from engaging in any illegal acts and practices alleged in the Verified Petition, in violation of Executive Law § 63(12) and General Business Law . . . Articles 22-a and 30 . . . ." Plaintiffs' Exh. A (Consent Order and Judgment) at 2.

As noted above, the Plaintiffs seek a judgment that the Consent Judgment Debt is nondischargeable under Sections 523(a)(2)(a) and 523(a)(4) of the Bankruptcy Code.

## Discussion

A.    Overview

The cornerstone of consumer bankruptcy is the "'fresh start'" that it offers to the "'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Mass.*, 127 S. Ct. 1105, 1107 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 287 (1991)). In *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934), the United States Supreme Court described the "fresh start":

---

[1] The Consent Order and Judgment directs that the $140,000 restitution amount:

be distributed in pro-rata fashion to: (1) the named individuals listed in the "Attorney General's Core Consumer Complaint Index" [annexed to the Consent Order and Judgment]; (2) individuals listed in the eighty (80) page Core membership list [annexed to the Consent Order and Judgment]; and (3) any consumer who files a complaint with the Attorney General within one hundred and twenty days (120) of service of [the Consent Order and Judgment].

Plaintiffs' Exh. A (Consent Order and Judgment at 3).

> One of the primary purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes."
>
> This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

*Local Loan Co.*, 292 U.S. at 244 (quoting *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 554-55 (1915) (citations omitted)).

But the "fresh-start policy does not apply to all debts and debtors." *Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 167 (2d Cir. 1999). As the Second Circuit observed:

> [T]here are circumstances where giving a debtor a fresh start in life is not the paramount concern and protection of the creditor becomes more important. For that reason, Congress in the Bankruptcy Code created several exceptions to the general rule that debts may be discharged in bankruptcy.

*Cazenovia College v. Renshaw (In re Renshaw)*, 222 F.3d 82, 86 (2d Cir. 2000).

For these reasons, Section 523 provides that a bankruptcy discharge does not apply to certain debts. This reflects "Congress' decision to allow certain competing public interests to override bankruptcy's 'fresh start' purpose." *Smith v. New York State Higher Educ. Servs. Corp. (In re Smith)*, 103 B.R. 392, 395 (Bankr. N.D.N.Y. 1988) (citing *Forsdick v. Turgeon*, 812 F.2d 801, 802 (2d Cir. 1987)). These exceptions to discharge go against the grain of the "fresh start" purpose that animates the Bankruptcy Code, and for this reason, they are narrowly construed in a debtor's favor. *See, e.g.*, *Gleason v. Thaw*, 236 U.S. 558, 562 (1915); *In re Renshaw*, 222 F.3d at 86; *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.

1998).

The party challenging the dischargeability of a debt bears the burden of showing that it comes within one of Section 523's exceptions to discharge, and that burden must be carried "by the preponderance of the evidence." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (citing *Grogan*, 498 U.S. at 291).

B.      The First Cause of Action - Nondischargeability Under Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt:

> (2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
>> (A)     false pretenses, a false representation, or actual fraud, other than a statement in writing respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

As this Court and others have found, a plaintiff must establish five elements to show that a debt is nondischargeable under Section 523(a)(2)(A).  These are:

> [F]irst, that the debtor made a false representation; second, that the debtor knew the representation was false at the time it was made; third, that the debtor made the false representation with the intent to deceive the creditor; fourth, that the creditor justifiably relied on the representation; and finally, that the creditor sustained a loss that was proximately caused by the false representation.

*Fleet Credit Card Servs., L.P. v. Macias (In re Macias)*, 324 B.R. 181, 187 (Bankr. E.D.N.Y. 2004) (citing *Chase Manhattan Bank, USA, N.A. v. Giuffrida (In re Giuffrida)*, 302 B.R. 119, 123 (Bankr. E.D.N.Y. 2003)).  *See also Charell v. Gonzalez (In re Gonzalez)*, 241 B.R. 67, 71-72 (Bankr. S.D.N.Y. 1999).

*Whether the Debtor made a false representation*

The first element that the Plaintiffs must establish is whether the Debtor made a false representation. Here, the record shows that the Debtor made three types of representations that proved to be false. First, the Debtor made false representations with respect to the size of the facility and the availability of services at Core Health & Fitness. Second, the Debtor made false representations with respect to the opening date of the facility. And third, the Debtor made false representations with respect to whether Core Health & Fitness was required to post a bond or other security under New York's General Business Law.

As to the size of the facility and the availability of services at Core Health & Fitness, the Debtor advertised Core Health & Fitness beginning in April 2004 using mailers, handbills, and e-mail notices that offered a "Grand Opening Pre-Sale Beginning 4/6/04" and a one-year membership for "$99.00 plus tax and registration fee." Plaintiffs' Exh. B (Flyers); Plaintiffs' Exh. G (e-mail dated April 28, 2004). These materials stated that the Core Health & Fitness facility would have "3 floors of total fitness" and many services, including:

> FULL WEIGHT ROOM, FULL LINE CARDIO EQUIPMENT, CARDIO
> THEATRE, GROUP FITNESS CLASSES, YOGA, PILATES, ROOF-TOP SUN
> DECK, SPINNING CLASSES, SILVER SNEAKERS PROGRAM, PHYSICAL
> THERAPY, MASSAGE THERAPY, JUICE BAR, INTERNET CAFE, PRO-
> SHOP, TANNING ROOMS, WEIGHT LOSS PROGRAMS, NUTRITION
> COUNSELING, CHILDREN'S JAMBOREE, SAUNAS, BODY
> CONDITIONING CLASSES, PERSONAL TRAINING, NGA
> CERTIFICATION, BOXING, STEP AEROBICS, BODYBUILDING, GROUP
> TRAINING, KICK BOXING

Plaintiffs' Exh. B (Flyers). *See* Plaintiffs' Exh. G (e-mail dated April 28, 2004). The Debtor acknowledges that in its two weeks of operation, Core Health & Fitness did not offer three floors of facilities, or more than a few of the itemized services. *See* Joint Pre-Trial Statement at 3. As

a result, the Debtor's representations as to the size of the facility and the availability of services proved to be false.

As to the opening date of the Core Health & Fitness facility, the Debtor initially stated that the facility would be open for business on June 1, 2004.  Joint Pre-Trial Statement at 3.  But this was not to be, and beginning in late May, the Debtor issued e-mails announcing a series of delays and alternative arrangements.  For example, a May 29, 2004, e-mail stated that the June 1, 2004, opening date had been "moved . . . to June 25, 2004" because of "an architectural setback."  Plaintiffs' Exh. G (e-mail dated May 29, 2004).  The May 29 e-mail invited consumers to stop by or call with any questions or concerns.  *Id*.

That was followed by the Debtor's June 29, 2004, e-mail which stated:

> We deeply regret having not opened on our said opening date.  The main problem has been that we have not been able to acquire the signature from the city building inspectors as quickly as we had anticipated . . . .  Our expected opening date will be within three and a half weeks, but hopefully sooner . . . .  [W]e fully intend to take care of each and everyone of our members to our utmost capability.  For those of you that had obtained your memberships in April we will be giving you two months free of charge that will be extended to the end of your first year contract.  In essence, you will be receiving 14 months for the price that you paid.

> In addition, for those that require gym facilities, we are able to supply you with a facility free of charge during the interim of our final days of construction.  The gym is located at Chambers and Broadway.  It is called 24/7 Fitness, a fully functioning gym equipped with all the basic physical training needs.  If you are indeed interested in acquiring use of 24/7 Fitness, you will need to call us . . . .  We will then need to call 24/7 Fitness, give them your information, then call you back within a day and you will be set to use their facility.  Again this is free of charge until Core Health and Fitness opens.

> Again we offer our deepest apologies and hope that we have not inconvenienced you too much.  We realize your disappointment, as we are sure that you realize ours as well.  The staff at Core wants the gym to be up and running as quickly as possible and we are exerting every effort to obtain that goal at the least disruption to you . . . .

Plaintiffs' Exh. G (e-mail dated June 29, 2004). And an August 2, 2004, e-mail stated that "We will be open for classes this Monday, August 9 . . . Just after that, the rest of the club will open." Plaintiffs' Exh. G (e-mail dated August 2, 2004).

It is plain from the record that the Core Health & Fitness facility did not open for business on June 1 or June 25, 2004, and that while selected classes were offered for a brief period in August, "the rest of the club" did not open thereafter. As a result, the Debtor's representations as to the opening date of the Core Health & Fitness facility proved to be false.

As to whether Core Health & Fitness was required to post a bond or other security under New York's General Business Law, the Core Health & Fitness Membership Agreement stated that Core Health & Fitness was exempt from the bonding requirements under New York's General Business Law. Plaintiffs' Exh. H (Core Health & Fitness Membership Agreement ¶ 22). *See* pp. 43-44, *infra*. But the record shows that the fees charged by Core Health & Fitness exceeded the maximum amount permitted to be charged by an exempt entity, and the Membership Agreement included an automatic renewal provision, which was not an allowed term by an exempt entity. *See* pp. 43-44, *infra*. As a result, the Debtor's representations as to whether Core Health & Fitness was required to post a bond or other security proved to be false.

For these reasons, the Court finds that the Plaintiffs have established the first element of their claim under Section 523(a)(2)(A), that the Debtor made a false representation.

*Whether at the time he made them, the Debtor knew that the representations were false*

The second element that the Plaintiffs must establish is whether at the time the Debtor made the representations, he knew them to be false. "'A misrepresentation is fraudulent if the maker . . . knows or believes . . . the matter is *not* as' represented, or 'does *not* have the

confidence in the accuracy of his representation' as stated or implied, or 'knows . . . he does *not* have the basis for his representation' as stated or implied." *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 407 (5th Cir. 2001) (emphasis in original) (quoting RESTATEMENT (SECOND) OF TORTS § 526).  As the court stated in *Visotsky v. Woolley (In re Woolley)*, 145 B.R. 830 (Bankr. E.D. Va. 1991), this element is satisfied if "the debtor's representation was known to be false or recklessly made without knowing whether it was true or false."  *In re Woolley*, 145 B.R. at 834 (citations omitted).  As the court explained:

> Reckless conduct refers to unreasonable conduct in disregard of a known or obvious risk from which it is highly probable that harm would follow.  It is usually accompanied by a conscious indifference to the consequences.  In contrast, negligence is characterized as mere thoughtlessness or inadvertence or simple inattention.
>
> . . . [T]he conduct must exceed negligence and rise to the level of reckless disregard for truth.  Recklessness is usually determined by a pattern of conduct.

*In re Woolley*, 145 B.R. at 834 (citations omitted).

<u>The Debtor's efforts to establish the Core Health & Fitness business</u>

The Debtor's efforts to establish the Core Health & Fitness business provide some background and context for considering whether the Plaintiffs have established that at the time the Debtor made statements with respect to the size of the facility and the availability of services at Core Health & Fitness, the opening date of the facility, and whether Core Health & Fitness was required to post a bond or other security under New York's General Business Law, he knew them to be false.

When the Debtor began to solicit consumers to join Core Health & Fitness, he had many years of experience in both the operation and the ownership of a health club business.  The Core Health & Fitness Business Plan describes the Debtor as follows:

-12-

> CEO, John Suarez is an experienced physical fitness guru with an expertise in the fitness industry having held managerial positions at other established fitness clubs including his own development of Exodus fitness Club in East Williamsburg [and] also holds an extensive background as a Certified Personal Trainer.

Plaintiffs' Exh. J (Core Fitness Club Incorporated Business Plan).  And the Debtor described his

experience and training in the health club and fitness industry as follows:

> Q       Are you familiar with the health club business?
> A       Yes, I am.
> Q       How are you familiar with the business?
> A       Going back many years.  I've worked, I've worked out, I'm a body-building champion, physical fitness instructor.  It just goes back.
> Q       When you say it goes back many years, how many years are we talking about?
> A       Well, I grew up around the fitness industry with my father . . . .  I've worked for fitness clubs, and in 2001 that was the first time I opened up a club, which was Exodus Fitness.
> Q       How many fitness clubs have you worked for?
> A       I've worked for three fitness clubs.
> . . .
> Q       And have you ever received any formal training in the operation of a health club?
> A       Sure.
> Q.      And what did that training consist of?
> . . .
> A       . . .  I have worked with John Kemper over at Diamond's in New Jersey.  I worked with Waday Washington here on 24th.  He was as well as a good friend, he was also an advisor, someone I would go to all the time.  Even before I even had ideas of opening up a club, he was the one basically that would tell me the ins and outs, and you know, what could be done . . . what kind of space you would need for certain type of clubs, things like that.

October 13 Trial Tr. at 89:9-92:15.  *See also* October 13 Trial Tr. at 93:16-25.

The Debtor took several steps to establish Core Health & Fitness as a health club

business at the same time that he was making the representations at issue to consumers.  He

described the initial steps that he took to raise funds for the business and locate and develop

space for Core Health & Fitness:

Q       After you sold your half of Exodus in 2003 what, if anything, did you do
        pertaining to the health club industry?
A       Well, I just took some time off.  I'm a carpenter by skill, so I just did some
        of that until I saved up some more money, and at the time I live[d] in
        Williamsburg.  I live[d] in the area for 39 years and everybody there
        [knew] me.  So I did a lot of things in the neighborhood as far as
        carpentry, stuff like that.  Got an opportunity with this location, and that's
        how Core came about, and whatever I had in my savings that I got from
        selling . . . Exodus, I went forward with that and put it into Core.
Q       How did you begin Core?
A       Well, it was first an idea.  It was first I saw the location, and it was
        something – everything was perfect.  The landlord, myself we came to – it
        was an empty garage.  It was a three-floor garage, huge space.  The
        amount of rent he was going to charge me was ideal.  It was perfect for
        that amount of space in Williamsburg.  Right now a space like that you
        pay in the millions.  I wasn't paying that.  So he gave me a great lease.  He
        gave me the key.  I basically – he told me, "Do what you need to do."  I
        know him personally.
. . .
Q       Describe how you came about locating the Core location at 102 North
        Sixth Street in Brooklyn.
A       . . . I'm familiar with the owners, . . . he's very big in construction.  He
        owns a very big worldwide corporation, . . . at the time I had a girlfriend
        that she also knew the family of the owner . . . .  I met him and he liked
        the idea that I had, so he allowed me to go in and do what I needed to do.
Q       And what, if anything, did you do?
A       Well, I renovated the whole place from a raw space, from a very,
        completely raw space.  I hired [an] architect, hired contractors, . . . put [in]
        phone lines.  I put computer lines.  I got a business account.  I did
        everything possible to start the business, well, the building, the
        construction of it.  There's three floors.

October 13 Trial Tr. at 95:7-96:3; 98:3-18.

        In March 2003, Core Health & Fitness was incorporated under the laws of the State of

New York.  *See* Defendant's Exh. 2 (Certificate of Incorporation for Core Health & Fitness, Inc.

filed March 19, 2003); Defendant's Exh. 4 (By-Laws of Core Health & Fitness, Inc. dated March

19, 2003).  The Debtor also secured an Employer Identification Number for Core Health &

Fitness.  *See* Defendant's Exh. 3 (Employer Identification Number Cover Sheet for Core Health

& Fitness).

The Debtor opened bank accounts in the name of Core Health & Fitness at HSBC Bank and Citibank. On February 24, 2004, he opened a bank account at HSBC Bank (the "HSBC Account") with a $35,000 check representing one-half of planned investment funds from an outside investor. October 18 Trial Tr. at 16:3-12. The HSBC Account was closed after that $35,000 check was returned for insufficient funds. October 18 Trial Tr. at 156:1-9. The Debtor opened the Citibank Account in mid-April 2004. October 13 Trial Tr. at 100:14-15. The Debtor also purchased a commercial general liability insurance policy issued by Zurich American Insurance Company naming Core Health & Fitness as the insured in July 2004. *See* Defendant's Exh. 12 (Commercial Insurance Policy No. EOL9012328-00).

The Debtor negotiated with the owner of the Premises for a lease at a monthly rental of $12,000 and received a proposed form of commercial lease between A & I Realty Corp., Inc., and Core Health & Fitness for space at 102 North 6th Street in Brooklyn for a ten-year term commencing June 1, 2004. October 18 Trial Tr. at 156:24-158:3; Defendant's Exh. 5 (Commercial Lease).

In April 2004, the Debtor hired Vincas Meilus Limited, the architect used by the owner of the Premises. October 13 Trial Tr. at 124:11-15. The Debtor explained that Mr. Meilus "[has] been the architect for that building for over 20 years," and that Ingram S. Carner, who prepared plans approved by the Department of Buildings in 2002 and 2004, was an "associate" of Mr. Meilus. October 18 Trial Tr. at 151:9-12; 151:25-152:8. Mr. Carner designed the retail store while Mr. Meilus designed the Core Health & Fitness facility. October 18 Trial Tr. at 152:5-8.

The Debtor described his understanding of the services that Mr. Meilus would provide to

Core Health & Fitness:

> A    Well, he was supposed to set up the plans, set up the space . . . to see
> what's legal, what's the weight limit on the mezzanine area because we
> were going to use that as small locker rooms and aerobic area, so he made
> sure he went to the Building Department and got me the permits to start,
> you know, gutting out rubbish and starting at least to get the place ready
> until we [got the] change of occupancy certificate.
>
> Q    Do you know if he actually obtained any or filed those plans that you just
> stated with the Building Department?
>
> A    Well, I don't know because by that time that's when they locked me out of
> 102 North Sixth, when he was in the process of that.

October 18 Trial Tr. at 154:2-16.

In April 2004, the Debtor entered into a design and construction agreement and an

architectural design agreement for "The Design, and Construction of: CORE FITNESS facility."

The agreements provide that the work to be performed includes:

> Renovate existing warehouse and offices to a new fitness center to be located in
> the rear of the ground floor, the entire mezzanine and the entire second floor.
> Create a new additional mezzanine at the rear of the ground floor.  Relocate
> partitions on mezzanine and second floor.  New toilets on mezzanine.

Defendant's Exh. 7 (Design and Construction Agreement dated April 2004); Defendant's Exh. 8

(Architectural Design Agreement dated April 2004).

Mr. Meilus prepared floor plans with a "lower health club," and "retail store" on the

ground floor and rooms for "aerobics," "yoga," "massage," "men's locker," "women's locker,"

and a room labeled "children" for the childcare services, on the second floor.  Defendant's Exh.

11 (Floor Plans); Plaintiffs' Exh. L (same).  The floor plans also show a "mezzanine" and an

"open" area on the second floor.  Defendant's Exh. 11 (Floor Plans); Plaintiffs' Exh. L (same).

The Debtor paid Mr. Meilus $12,000 towards a total fee of $18,000 for these services.  October

-16-

18 Trial Tr. at 152:9-154:1; Plaintiffs' Exh. N (check nos. 1006, 1033).

The Debtor also relied upon Mr. Meilus to file and obtain the necessary construction

permits for the Core Health & Fitness facility.  He testified:

> A    [The Architect] was doing all the paperwork.  I know nothing about
> architectural or . . . engineering.  [He] just [gave] me the papers, [I] put
> them where they belong, and he put the original ones outside, and I
> continued doing what I was supposed to do with the gym.

October 13 Trial Tr. at 124:25-125:4.

Thomas Fariello, Deputy Borough Commission for the New York City Department of

Buildings in Kings County, whose duties include reviewing plans submitted for construction

work, and issuing permits, letters of completion, and certificates of occupancy, described the

process for obtaining a building permit for a health club.  October 18 Trial Tr. at 65:23-66:4.

Mr. Fariello explained that the first step is to obtain initial approval from the Board of Standards

and Appeals, and the next step is to submit a "full set of plans for Building Code compliance" to

the Department of Buildings.  October 18 Trial Tr. at 66:19-67:4.  Mr. Fariello explained:

> A    . . . You would go through a whole review process, and once you went
> through that you would be issued a permit to do this, and then you would
> construct the building, do your work, and when you were completed with
> that, we would inspect the building, and then you would be issued a
> certificate of occupancy.

October 18 Trial Tr. at 67:4-9.

Mr. Fariello stated that the Department of Buildings did not receive building plans or

issue a work permit for a three-story health club at the Premises.  October 18 Trial Tr. at 71:4-

11.  Rather, the Department of Buildings approved building plans in January 2002 "to make a

change in use for some storage area to make it into a warehouse and change some spaces up in

the mezzanine level to offices."  October 18 Trial Tr. at 67:20-22.  *See* Plaintiffs' Exh. K (Work

Permit No. 301236883-01-AL); Defendant's Exhs. 9, 10 (same); Plaintiffs' Exh. R (building

plans).  Revised and amended plans were accepted by the Department of Buildings in August

2004, but these showed a retail store and retail storage, not a health club facility.  *See* October 18

Trial Tr. at 67:22-25, 71:2-3; 75:6-9; Plaintiffs' Exh. S (amended building plans).

 In May 2004, the Debtor contracted with Juan Beltran for construction work on the

Premises.  *See* Defendant's Exh. 6 (Contract dated May 18, 2004).  On May 17, 2004, the Debtor

made a $3,000 payment for plumbing costs associated with the showers, locker rooms, and

bathrooms in the Core Health & Fitness facility.  October 18 Trial Tr. at 176:16-177:13.  The

Debtor incurred costs for lumber and other construction supplies and services regularly from at

least early April 2004 to early July 2004.  *See* Defendant's Exh. 22 (invoices and receipts for

construction supplies dated April 2, 2004, May 18, 2004, May 19, 2004, May 26, 2004, June 2,

2004, June 3, 2004, June 12, 2004, June 15, 2004, June 22, 2004, June 23, 2003, June 25, 2004,

July 6, 2004 ); Defendant's Exh. 16 (invoices and receipts for construction supplies dated May

28, 2004, June 3, 2004, June 7, 2004, June 8, 2004, June 10, 2004, June 22, 2004, June 24, 2004,

June 30, 2003).

 The Debtor purchased office furniture, computer equipment, and advertising, promotion,

and publicity services for Core Health & Fitness beginning in April 2004.  *See* Defendant's Exh.

19 (invoices and receipts for advertising, promotion, and publicity); Defendant's Exh. 21

(invoices and receipts for office furniture and equipment); Defendant's Exh. 23 (computer lease

and computer equipment purchase quote).

 The Debtor also purchased gym equipment for the Core Health & Fitness facility from

Life Fitness and others beginning in April 2004.  October 13 Trial Tr. at 136:5-17.  *See*

Defendant's Exh. 20 (invoices and receipts for gym equipment dated April 27, 2004, April 28, 2004, May 13, 2004, May 20, 2004, June 7, 2004, June 24, 2004).  Life Fitness delivered gym equipment including "weights, dumbbells, barbells, fixed dumbbells," and "a leg press and a calf machine" to the Core Health & Fitness facility in July 2004.  October 18 Trial Tr. at 146:17-24, 148:22-24.

In addition to investing his own funds in the Core Health & Fitness venture, the Debtor raised money from outside investors.  The initial outside investors were Christine Kern and her husband Frank LoMinico, who agreed to invest $70,000 in Core Health & Fitness.  October 18 Trial Tr. 15:9-18; Defendant's Exh. 13 (unsigned Shareholder Agreement between Core Health & Fitness and Frank LoMinico and Christine Kern for 35 shares of Core Health & Fitness stock).

In February 2004, the Debtor received a $35,000 check from Mr. LoMinico, representing one-half of the planned investment.  October 18 Trial Tr. at 15:22-23; Defendant's Exh. 13 (unsigned Shareholder Agreement between Core Health & Fitness and Frank LoMinico and Christine Kern for 35 shares of Core Health & Fitness stock); Defendant's Exh. 14 (check dated February 23, 2004, for $35,000 drawn on Mr. LoMinico's account and payable to Core Health & Fitness, Inc.).  On February 24, 2004, the Debtor deposited that check in the HSBC Account, and on March 1, 2004, the Debtor learned that the check was returned for insufficient funds.  October 18 Trial Tr. at 16:10-21.  *See* Defendant's Exhibit 14 (Notice of Returned Check dated March 1, 2004).  Ms. Kern replaced the $35,000 check with a check for $70,000 but the Debtor learned that "it was no good."  October 18 Trial Tr. at 17:8-16.

The Debtor next approached Remy Arias, an acquaintance of some seventeen years, and asked him to invest in Core Health & Fitness.  Mr. Arias first invested in Core Health & Fitness

in April 2004, by making credit available to the Debtor to acquire gym equipment and other materials for the business. October 18 Trial Tr. at 116:6-13. In April 2004, the Debtor used Mr. Arias's Bank One credit card account to purchase Life Fitness equipment. Defendant's Exh. 35 (Remy Arias Bank One account summary for April 29, 2004 to May 28, 2004). Mr. Arias also incurred charges on his American Express and Discover Card accounts on behalf of Core Health & Fitness. October 18 Trial Tr. at 125:7-9. And Mr. Arias obtained a credit card on his Bank One account in the Debtor's name to be used in connection with Core Health & Fitness. October 18 Trial Tr. at 114:11-16.

In June 2004, Mr. Arias took out a $25,000 loan from The Bank of New York for the purpose of investing in Core Health & Fitness, and he invested those funds in the business. October 18 Trial Tr. at 109:22-110:4; Defendant's Exh. 15 (Bank of New York Loan Agreement dated June 18, 2004). Mr. Arias's total investment in Core Health & Fitness was approximately $71,500. *See* October 18 Trial Tr. at 128:11-130:5.

The Debtor and the owner of the Premises never entered into a lease for the Premises. At first, the Debtor did not have the funds to pay the $36,000 rent and security deposit required under the proposed lease. The Debtor's first check to the owner for rent and the security deposit was returned for insufficient funds after Mr. LoMinico's $35,000 check did not clear. October 18 Trial Tr. at 155:7-12. The Debtor explained that the owner "understood" and that "[he] just gave me some time . . . ." October 18 Trial Tr. at 159:1-4. The Debtor's second check to the owner for rent and the security deposit also was returned for insufficient funds because "there was a problem with the credit card companies." October 18 Trial Tr. at 158:20-23. Again, the Debtor stated that the owner inquired about the check but "basically . . . let [him] continue."

-20-

October 18 Trial Tr. at 160:13-14.  The Debtor stated that he had an "understanding" with the owner that the owner would hold the lease until the Core Health & Fitness facility was open for business and sign it then.  October 18 Trial Tr. at 182:14-18.

Two consumers testified about their experience with Core Health & Fitness.  Jason Rodgers received promotional items from Core Health & Fitness in April and May 2004.  One offered a "Pre Sale Blow Out Beginning 4/6/04" and a one-year promotional discounted membership for "only $99.00 plus tax & registration fee."  Plaintiffs' Exh. B (Flyers).  Mr. Rodgers visited the Core Health & Fitness facility at the Premises in early May 2004, while it was under construction, and saw a "floorplan on the wall" and "some kind of gym equipment to the left."  October 13 Trial Tr. at 33:19-21.  He was told that the "grand opening was at the beginning of June" and that by joining now, "the kind of fee that people normally pay per month would be available to [him] for one year's membership."  October 13 Trial Tr. at 34:8-11; 35:15-16.  On April 24, 2004, Mr. Rodgers entered into the Core Health & Fitness Membership Agreement and paid a total fee of $157 for a one-year membership commencing June 1, 2004.  Plaintiffs' Exh. C (Jason Rodgers Core Health & Fitness Membership Agreement dated April 24, 2004).

Mr. Rodgers returned to the Core Health & Fitness facility in early June 2004, but found that it had not opened.  October 13 Trial Tr. at 35:15-22.  Mr. Rodgers was told that Core Health & Fitness had "'r[u]n into some difficulties'" and was "'hoping to open again the beginning of next month or the end of this month.'"  October 13 Trial Tr. at 36:3-10.  Mr. Rodgers visited the facility in early July 2004, again in early August 2004, and finally at the end of September 2004, when he "found out that they weren't there anymore."  October 13 Trial Tr. at 39:19-22.  The

Core Health & Fitness facility was not open during any of Mr. Rodgers' visits, and Mr. Rodgers did not receive a refund of his fee.  October 13 Trial Tr. at 40:5-25.

Julie Separovic received promotional materials from Core Health & Fitness in April 2004, obtained additional information from the Core Health & Fitness website, and entered into the Core Health & Fitness Membership Agreement together with her husband on July 1, 2004. October 13 Trial Tr. at 54:22-55:1; Plaintiffs' Exhs. B (Flyers), D (Julie Separovic and Leonard DiDesidero Core Health & Fitness Membership Agreements dated July 1, 2004).  At that time, she understood that the Core Health & Fitness facility would be "opening in a couple of weeks." October 13 Trial Tr. at 66:9-10.  Later in July, Ms. Separovic telephoned Core Health & Fitness "every week or so and they told me it would be soon."  October 13 Trial Tr. at 66:13-14.

Ms. Separovic received an e-mail dated August 8, 2004, from Core Health & Fitness announcing that fitness classes would begin the next day.  That e-mail stated in part:

> We are pleased to announce that Group Fitness Classes will begin Monday,
> August 9.  Here are the classes that have been added SO FAR: Monday 1 *pm*
> Yoga, 6 *pm* Step, 7 *pm* Body Sculpt.  Tuesday 1 *pm* Yoga, 5 *pm* Kick Boxing,
> 6 *pm* Boot Camp, Wednesday 1 *pm* Yoga, 5 *pm* Total Body, Thursday 1 *pm*
> Yoga, 5 *pm* Step, 6 *pm* Body Sculpt, 7 *pm* Abs, Friday 1 *pm* Yoga, 6 *pm* Body
> Sculpt, 7 *pm* Fit Dance, Saturday 1 *pm* Boot Camp, 2 *pm* Kick Boxing, 3 *pm* Abs.

Plaintiffs' Exh. E (e-mail dated August 8, 2004) (emphasis in original).  Ms. Separovic took yoga and dance classes at Core Health & Fitness from August 12 to August 20, but soon thereafter, she visited the facility and saw that "the door was locked, and there was no way to access, to get in there, and there was nobody there to talk to."  October 13 Trial Tr. at 60:1-8; 63:4-20.

In late August 2004, without notice, the Debtor was locked out of the Premises by the owner.  The Debtor stated that the lockout was "still a mystery" to him.  October 18 Trial Tr. at

184:2.  *See* October 18 Trial Tr. at 184:2-14.  The Debtor stated:

> A        . . . I never got a full explanation from the [owner].  I lost contact with him
> when I was trying to call him.  All Carl [the owner's representative] kept
> saying was that that's what [the owner] wanted because he didn't – you
> know, with the check bouncing, and I told Carl, "Well, I already spoke to
> the owner.  I already told him personally what was happening."  He told
> me what could we do.  He said for me to open.  That's why I opened on
> August 9th because I had his approval.
>
> Next thing I know after the two weeks of opening the aerobic area and the
> sauna area I found – I came one morning and there [were] locks on there.

October 18 Trial Tr. at 185:7-18.

<u>The Debtor's representations as to the size of the facility and the availability of services</u>

Here, the record shows that at the time that the Debtor made representations as to the size of the Core Health & Fitness facility and the range of services to be provided, he was taking many steps, including opening bank accounts, investing his own funds, negotiating and entering into a lease and other contracts, locating and developing space, purchasing equipment, and raising funds from outside investors, that indicate that he sincerely expected that Core Health & Fitness would offer a full range of services on two floors and a mezzanine level at the Premises. If the Debtor's representations as to the physical facilities were a sham when they were made, then there would have been no need for the Debtor to incur the expenses to hire an architect, purchase lumber and other construction supplies, and otherwise prepare to construct a health club facility.  If the Debtor's representations as to the availability of services were a fiction from the outset, then there would have been no need for the Debtor to purchase gym equipment or to pay $12,000 for building plans that provide space for aerobics, yoga, massage, locker rooms, and a children's play area.

For these reasons, the Court finds that the Plaintiffs have not established the second

element of their claim under Section 523(a)(2)(A), that the Debtor knowingly or recklessly made a false representation, with respect to his representations as to the size of the facility and the availability of services at Core Health & Fitness.

<u>The Debtor's representations as to the opening date of the Core Health & Fitness facility</u>

Here, the record shows that at the time that the Debtor made representations as to the opening date of the Core Health & Fitness facility, he was taking steps to establish the Core Health & Fitness business, extending the terms of consumers' contracts, providing consumers with access to alternative health club facilities, and inviting consumers to contact him and Core Health & Fitness with their questions. Viewed through the sharp lens of hindsight, the Debtor's statements as to the projected opening dates for the Core Health & Fitness facility were incautiously optimistic, and they proved to be inaccurate.

But the Debtor believed that notwithstanding the nonpayment of rent and security, he had an "understanding" with the owner of the Premises that he would hold the lease until Core Health & Fitness was operating. October 18 Trial Tr. at 182:14-18. The Debtor explained that he knew nothing about the architectural and engineering aspects of the Core Health & Fitness facility, and relied upon Mr. Meilus, the architect, to file and obtain the necessary permits for the construction of the facility. October 13 Trial Tr. at 124:25-125:4.

And at the same time that the Debtor made representations as to the opening date of Core Health & Fitness, he was taking many steps, including committing his own funds and efforts, toward opening the facility. The Debtor also extended the contract period for consumers so that despite the delayed opening, they would receive the benefit of a one-year or longer membership. The Debtor also made temporary alternative arrangements for consumers to use the 24/7 Fitness

facility.  If, at the time the Debtor made representations as to the opening date of the Core Health & Fitness Facility, he knew that they were false, then there would have been no reason for him to offer these accommodations to consumers.

For these reasons, the Court finds that the Plaintiffs have not established the second element of their claim under Section 523(a)(2)(A), that the Debtor knowingly or recklessly made a false representation, with respect to his representations as to the opening date of the Core Health & Fitness facility.

<u>The Debtor's representations as to whether Core Health & Fitness was required to post a bond or other security</u>

Here, the record shows that at the time that consumers were entering into the Core Health & Fitness Membership Agreement, the Debtor had many years of experience in both the operation and the ownership of a health club business.  The Core Health & Fitness Business Plan pointed to his management positions at other "established fitness clubs."  Plaintiffs' Exh. J (Core Fitness Club Incorporated Business Plan).  The Debtor also consulted with experienced advisors in the health and fitness industry.  October 13 Trial Tr. at 89:10-92:15.

The Core Health & Fitness Membership Agreement stated, in a paragraph setting forth "IMPORTANT INFORMATION ABOUT YOUR PAYMENT OPTIONS," that "New York State Law requires certain gyms to post a bond or other financial security to protect members in the event the gym closes," and that Core Health & Fitness "is exempt from this requirement since it gives members the option of paying on an installment basis."  Plaintiffs' Exh. H (Core Health & Fitness Membership Agreement) ¶ 22.  But as described above, that statement was not accurate.  Core Health & Fitness's total fees exceeded the $150 maximum permitted for an exempt health club business.  And while the Core Health & Fitness Membership Agreement

-25-

offered consumers the option to pay on an installment basis, it also contained an automatic renewal provision.  As a result, Core Health & Fitness was not exempt from the requirement to post a bond or other security.  *See* pp. 43-44, *infra*.  Based on all of these circumstances, including the Debtor's experience in the health club and fitness industry, and the express – and inaccurate – statement in  the Core Health & Fitness Membership Agreement, the Debtor either knew that the representation that Core Health & Fitness was exempt from the requirement to post a bond or other security was false, or was reckless in not knowing of its falsity.

For these reasons, the Court finds that the Plaintiffs have established the second element of their claim under Section 523(a)(2)(A), that the Debtor knowingly or recklessly made a false representation, with respect to his representations as to whether Core Health & Fitness was required to post a bond or other security.

## Whether the Debtor made the representations with the intent to deceive the Plaintiffs

The third element that the Plaintiffs must establish is whether at the time the Debtor made the representations, he did so with the intent to deceive the Plaintiffs.  Because the Plaintiffs have not satisfied the second element of their claim under Section 523(a)(2)(a) with respect to the Debtor's representations as to the size of the facility and the availability of services, and as to the opening date of the Core Health & Fitness facility, the Court must consider the third element only as to the Debtor's representations as to whether Core Health & Fitness was required to post a bond or other security.  *See Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st Cir. 1997) (observing that "if [the plaintiff] failed to establish any one of the elements [of a Section 523 claim] by a preponderance of the evidence, then the court should reject his claim.") (citing cases).

In *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367 (5th Cir. 2005),

the Fifth Circuit described the types of debts that satisfy this element:

> Debts that satisfy the third element, the scienter requirement, are debts obtained
> by frauds involving "moral turpitude or intentional wrong, and any
> misrepresentations must be knowingly and fraudulently made." *In re Martin*, 963
> F.2d 809, 813 (5th Cir. 1992). An intent to deceive may be inferred from
> "reckless disregard for the truth or falsity of a statement combined with the sheer
> magnitude of the resultant misrepresentation." *In re Norris*, 70 F.3d 27, n.12 (5th
> Cir. 1995), citing *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994). Nevertheless,
> an honest belief, even if unreasonable, that a representation is true and that the
> speaker has information to justify it does not amount to an intent to deceive.
> *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997). Thus, a "dumb but
> honest" defendant does not have scienter. *Id.*, citing 2 F. Harper, *et al.*, LAW OF
> TORTS § 7.3, at 393 (2d ed. 1986).

*In re Acosta*, 406 F.3d at 372.

Other courts have agreed that a plaintiff must show "moral turpitude" or "intentional

wrong" in order to state and prove a nondischargeabilty claim under Section 523(a)(2)(A). *In re*

*Gonzalez*, 241 B.R. at 71. "[M]ere negligence, poor business judgment or fraud implied in law

(which may exist without imputation of bad faith or immorality) is insufficient." *Id*. *See also*

*Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991).

This Court and others have recognized that a debtor's intent may be inferred from the

totality of the circumstances, because direct proof of a debtor's state of mind is generally not

available. *See In re Macias*, 324 B.R. at 192; *American Express Centurion Bank v. Truong (In*

*re Truong)*, 271 B.R. 738, 745 (Bankr. D. Conn. 2002); *Kuper v. Spar (In re Spar)*, 176 B.R.

321, 328 (Bankr. S.D.N.Y. 1994). As one court stated, "'intent to deceive may be inferred when

the totality of the circumstances presents a picture of deceptive conduct by the debtor, which

indicates that he did intend to deceive and cheat the [creditor.]'" *Hong Kong Deposit and Guar.*

*Co. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 53 (S.D.N.Y. 1990) (quoting *In re Schlickmann*, 6

B.R. 281, 282 (Bankr. D. Mass. 1980)).

As described below, Section 622-a requires a health club business to "file [with the Secretary of State] and at all times maintain" a bond, letter of credit, or certificate of deposit in various amounts, depending upon the term of the contract.  N.Y. GEN. BUS. LAW § 622-a(1), (2).  *See* pp. 43-44, *infra*.  While there are limited grounds for exemption from this requirement, they do not apply to Core Health & Fitness.  N.Y. GEN. BUS. LAW § 622-a(10).  *See* p. 44, *infra*.

The Plaintiffs have established that the Debtor knowingly or recklessly made a false representation with respect to his representations as to whether Core Health & Fitness was required to post a bond or other security.  *See* pp. 25-26, *supra*.  But knowing or reckless behavior is not the same as an intent to deceive, and does not, without more, rise to a level of misconduct marked by "moral turpitude" or "intentional wrong."

Put another way, while recklessness may be a sufficient basis to infer knowledge, it does not, without more, demonstrate a deliberate intention to cheat or mislead.  *See In re Acosta*, 406 F.3d at 372 (recklessness "combined with the sheer magnitude of the resultant misrepresentation" may support an inference of an intent to deceive); *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003) (finding debtor's actions in executing closing documents without reading them were reckless but did not rise "to the level of actual fraud or deceit as required by § 523(a)(2)(A).").

Here, the record shows that at the time the Debtor made representations as to whether Core Health & Fitness was exempt from the requirement to post a bond or other security under New York's General Business Law, he acted with a reckless disregard for whether the representation was false, but he did not act in a way that shows "moral turpitude or intentional

-28-

wrong." Nor was the magnitude of the misrepresentation of a character to render it tainted with an intent to deceive or to defraud. Finally, it is difficult to see what motive the Debtor would have had to deceive consumers by representing that Core Health & Fitness was exempt from posting a bond or other security, when in fact, it was not exempt. The Debtor's representation offered the prospect of *less* protection to consumers than they were entitled to under Section 622-a, not more. It seems, therefore, unlikely to have been triggered by an intent to deceive.

For these reasons, the Court finds that the Plaintiffs have not established the third element of their claim under Section 523(a)(2)(A), that the Debtor made a false representation with the intent to deceive the Plaintiffs, with respect to his representations as to whether Core Health & Fitness was required to post a bond or other security.

*The remaining elements: whether the Plaintiffs justifiably relied on the representations, and whether the Plaintiffs sustained a loss that was proximately caused by the false representations*

The remaining elements of a claim under Section 523(a)(2)(A) are whether the Plaintiffs justifiably relied on the representations, and whether the Plaintiffs sustained a loss that was proximately caused by the false representations. Based on the entire record, the Court notes that the record may well present fair grounds for dispute as to each of these elements. Because the Plaintiffs have not satisfied the second element of their claim under Section 523(a)(2)(a) with respect to the Debtor's representations as to the size of the facility and the availability of services, and as to the opening date of the Core Health & Fitness facility, and have not satisfied the third element of their claim as to the Debtor's representations as to whether Core Health & Fitness was required to post a bond or other security, it is not necessary for the Court to determine whether the Plaintiffs have satisfied these elements of their claim. *See Palmacci,* 121 F.3d at 788.

-29-

Based on the entire record, the Court finds that the Plaintiffs have not established by a preponderance of the evidence that the Consent Judgment Debt should be excepted from discharge under Section 523(a)(2)(A) of the Bankruptcy Code.

C.    The Second Cause of Action - Nondischargeability Under Section 523(a)(4)

As a Second Cause of Action, the Plaintiffs allege that the Consent Judgment Debt is excepted from discharge under Section 523(a)(4) of the Bankruptcy Code, which provides that a "discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 534(a)(4).  *See* Complaint ¶¶ 21-23.  Specifically, the Plaintiffs argue that the Consent Judgment Debt should not be discharged because it arose from a "fraud or defalcation while [the Debtor acted] in a fiduciary capacity."  Complaint ¶¶ 22-23.

This Court and others have observed that "[a] creditor must satisfy three elements in order to invoke the Section 523(a)(4) exception to the dischargeability of a debt."  *Chao v. Duncan (In re Duncan)*, 331 B.R. 70, 77 (Bankr. E.D.N.Y. 2005) (citing *Zohlman v. Zoldan (In re Zoldan)*, 226 B.R. 767, 772 (S.D.N.Y. 1998); *Maciolek v. Firer (In re Firer)*, 317 B.R. 457, 465-66 (Bankr. D. Conn. 2004); *Eavenson v. Ramey*, 243 B.R. 160, 164 (N.D. Ga. 1999); *Harsch v. Eisenberg (In re Eisenberg)*, 189 B.R. 725, 730 (Bankr. E.D. Wis. 1995)).

First, the creditor must show that the debt was incurred in connection with an "express or technical trust[]."  *In re Zoldan*, 226 B.R. at 772-73.  *See Trustees of the Colo. Ironworkers Pension Fund v. Gunter (In re Gunter)*, 304 B.R. 458, 460 (Bankr. D. Colo. 2003).  Second, the creditor must show that the debtor acted in a fiduciary capacity with respect to the trust.  *In re Zoldan*, 226 B.R. at 772; *Gore v. Kressner (In re Kressner)*, 155 B.R. 68, 73 (Bankr. S.D.N.Y.

1993).  Finally, the creditor must show that the debtor engaged in fraud or a defalcation within the meaning of bankruptcy law.  *In re Duncan*, 331 B.R. at 77; *In re Zoldan*, 226 B.R. at 775. *See also In re Hayes*, 183 F.3d at 169.

<u>*Whether the Consent Judgment Debt arose in connection with an express or technical trust*</u>

The Plaintiffs must first establish that the Consent Judgment Debt arose in connection with an "express or technical trust."  *See In re Zoldan*, 226 B.R. at 772 ("Section 523(a)(4) applies only to express or technical trusts.").

An express trust "is initiated by one entity's transfer of property to another entity coupled with a manifestation of an intention to create a trust."  *First Am. Title Ins. Co. v. Eberhart (In re Eberhart)*, 283 B.R. 97, 100 (Bankr. D. Conn. 2002) (citing RESTATEMENT (SECOND) OF TRUSTS §§ 2, 23 (1959)).  *See also Besroi Constr. Corp. v. Kawczynski (In re Kawczynski)*, 442 F. Supp. 413, 416 (W.D.N.Y. 1977) (defining the elements of an express trust as "an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship.").

An express trust may be created by formal trust agreement or by statute.  For example, Article 3-A of the New York Lien Law provides that funds received by general contractors for the improvement of real property are assets of a trust for the benefit of, among others, subcontractors.  N.Y. LIEN LAW § 70.  *See also Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 15-16 (Bankr. S.D.N.Y. 2002) ("Article 3-A [of the New York Lien Law] clearly creates an express trust within the meaning of Section 523(a)(4)"); *Traux & Hovey, Ltd. v. Grosso (In re Grosso)*, 9 B.R. 815, 820 (Bankr. N.D.N.Y. 1981) (same); *Carey Lumber Co. v. Bell*, 615 F.2d 370, 375 (5th Cir. 1980) (finding that the Oklahoma lien statute created an express trust like the New York Lien Law because it defines trust res and duties of the trustee).

Section 523(a)(4) is not limited to trusts arising under formal trust agreements, or trusts expressly imposed by statute. Courts have extended Section 523(a)(4) to "relationships in which 'technical trust type' obligations are imposed pursuant to statute or common law." *Hutton v. Schulman (In re Schulman)*, 196 B.R. 688, 697 (Bankr. S.D.N.Y. 1996). *See, e.g.*, *Quaif v. Johnson*, 4 F.3d 950, 954 (11th Cir. 1993) (Georgia statute requiring insurance agents to promptly account for and remit payments of funds to the insurer and to abstain from co-mingling funds created fiduciary duties sufficient to create a technical trust); *Zois v. Cooper*, 268 B.R. 890, 895 (S.D.N.Y. 2001), *aff'd*, 73 Fed. Appx. 509 (2d Cir. 2004) ("An attorney-client relationship forms a fiduciary bond under Section 523(a)(4).") (citing *In re Hayes*, 183 F.3d 162, 168 (2d Cir. 1999); *Eavenson*, 243 B.R. at 166 ("ERISA statutorily satisfies the elements of a technical trust under § 523(a)(4)" and creates fiduciary duties between the ERISA plan fiduciary and participants); *In re Zoldan*, 226 B.R. at 774 (New York common law creates fiduciary relationship among partners under Section 523(a)(4)); *Artis v. West (In re West)*, 339 B.R. 557, 567 (Bankr. E.D.N.Y. 2006) (power of attorney under New York law created fiduciary relationship between principal and attorney-in-fact for purposes of Section 523(a)(4) where attorney-in-fact's obligations to the principal are heightened by state statutory or common law); *Anderson v. Currin (In re Currin)*, 55 B.R. 928, 933 (Bankr. D. Colo. 1985) (Colorado real estate licensing statute established fiduciary duties under Section 523(a)(4) with respect to brokers handling owners' rental revenues).

But Section 523(a)(4) does not extend to "[c]onstructive or implied trusts, or any trust where the existence of the trust is created merely on the basis of wrongful conduct (a trust *ex maleficio*) . . . ." *In re Zoldan*, 226 B.R. at 772. As the court in *In re Zoldan* explained: "the

-32-

fiduciary relationship must exist prior to the act creating the debt; a trust relationship cannot be said to arise merely from the wrongful conduct itself." *Id.  See also In re Hayes*, 183 F.3d at 169; *In re Gunter*, 304 B.R. at 461; *Air Traffic Conference of Am. v. Paley (In re Paley)*, 8 B.R. 466, 469 (Bankr. E.D.N.Y. 1981).

Here, the Plaintiffs argue that Section 622 of the General Business Law created the statutory trust necessary to satisfy the first element of their claim to except the Consent Judgment Debt from discharge under Section 523(a)(4).  *See* Plaintiffs' Pre-Trial Memorandum at 13-14, Adv. Pro. Docket 25.  Section 622 is contained within Article 30 of the General Business Law, which is the consumer protection statute applicable to the health club services industry.

To establish the existence of a statutory trust, the Plaintiffs must show that "property or money was entrusted to a 'trustee,' that a statute creates or identifies a 'fiduciary' duty, and finally, that the trust was in place when the defalcation giving rise to the debt occurred." *In re Duncan*, 331 B.R. at 77.  *See In re Gunter*, 304 B.R. at 460-61.  Some courts have also given weight to a "'legislative design to create a trust.'" *Bennett v. Wright (In re Wright)*, 282 B.R. 510, 515 (Bankr. M.D. Ga. 2002) (quoting *Georgia Lottery Corp. v. Daniel (In re Daniel)*, 225 B.R. 249, 251 (Bankr. N.D. Ga. 1998)).

The legislative intent behind Article 30 of the General Business Law is set forth in Section 620:

> 1.    The legislature finds that there exists in connection with a number of contracts for health club services, sales practices and business and financing methods which may have resulted in deception and financial hardship upon the people of the state, that existing legal remedies are inadequate to correct these abuses; that the health club services industry has a significant impact upon the economy and well being of this state and

its local communities, and that the provisions of this article relating to such contracts are necessary for the public welfare.

2.      The legislature declares that the purpose of this article is to safeguard the public and the ethical health club industry against deception and financial hardship, and to foster and encourage competition, fair dealing, and prosperity in the field of health club services by prohibiting or restricting false or misleading advertising, erroneous contract terms, harmful financial practices, and other unfair, deceptive and discriminatory practices which have been conducted by some health club operators.

N.Y. GEN. BUS. LAW § 620(1), (2).

Article 30 provides protection to consumers of health club services in several ways.  For example, Section 626 prohibits deceptive acts by a seller of health club services.  N.Y. GEN. BUS. LAW § 626.  And "seller" is defined to include not only an individual or entity which operates a health club business, but also one who "intends to operate a health club."  N.Y. GEN. BUS. LAW § 621(4).

Section 622 offers additional protection against financial hardship or loss to consumers who purchase services from a health club business before the health club facility is fully operational, through special requirements for the escrow and use of funds collected by the seller:

All moneys received by a seller pursuant to a contract for services for use by a buyer of a health club prior to the full operation of such health club shall be placed in escrow.

1.      Such funds shall be kept and maintained in an account separate and apart from any account maintained by or for the seller's personal use or for use in the construction or operation of the health club or for the payment or benefit of employees of the seller.

2.      The escrow account shall be established in a bank or trust company doing business in this state.

3.      The escrow account shall provide that the purpose of the account is to protect the consumer in the event that the seller fails to complete substantially and to open the facility within one year following

> establishment of the account.  Any buyer who has advanced moneys on
> deposit in the escrow account may maintain a representative action
> pursuant to the provisions of the civil practice law and rules to close the
> account and to release such moneys pro-rata to all buyers similarly
> situated if such health club facility has not been substantially completed
> and opened within one year of establishment of the account or if the buyer
> has not had the full use of another similar facility during this period.
>
> 4.      Within three business days of a request therefor, a monthly statement of
>         the escrow account is to be furnished to consumers who have advanced
>         funds or obligation until such account is no longer required by this article.
>         . . .

N.Y. GEN. BUS. LAW § 622(1)-(4).

Further protection against loss is provided to consumers through the requirement that the

funds escrowed by a heath club business may be released to the seller only upon completion of at

least one-half of the construction of the health club facility, and then only in a limited amount:

> The escrow account shall provide that funds deposited therein may be withdrawn
> by the seller upon the completion of the proposed construction in the following
> manner:  (i) one-third of the funds may be distributed to the seller upon
> completion of one-half of the proposed construction; (ii) not more than two-thirds
> of the funds which have been deposited in escrow may be released upon the
> completion of three-fourths of the proposed construction; (iii) the escrow agent
> my accept as evidence of partial completion certification of any architect or
> engineer licensed pursuant to the provisions of the education law that the
> proposed construction has been completed in accordance with the plans and
> specifications.

N.Y. GEN. BUS. LAW § 622(5).

And additional protection against loss is provided to consumers through the requirement

that the funds collected may not be fully released from escrow to the seller until the health club

facility has been completed and full operation has begun:

> The escrow account shall be released by the escrow agent to the seller not more
> than thirty days following full operation of the facility and certification of
> completion from any architect or engineer licensed pursuant to the provisions of
> the education law.

N.Y. GEN. BUS. LAW § 622(6).

As an alternative to establishing an escrow, a health club business may provide information to the Secretary of State that "reasonably demonstrates financial responsibility" sufficient to satisfy possible claims by consumers against the escrow required under Section 622. N.Y. GEN. BUS. LAW § 622(7). Whether the health club business elects to satisfy the requirements of Section 622 by keeping funds paid by consumers for health club services in an escrow account or by demonstrating "financial responsibility," the consumer protection purpose of the statute is served because consumers have a means to recover their payments to a health club business that does not open as planned.

Finally, in addition to Section 622's escrow requirements, Article 30 protects consumers when a fully operational health club facility goes out of business during the life of a consumer's contract for services. Section 622-a requires health club businesses that sell or renew memberships to "file [with the Secretary of State] and at all times maintain" a bond, an irrevocable letter of credit, or a certificate of deposit in an amount that depends on the terms of the consumer contract. N.Y. GEN. BUS. LAW § 622-a(1), (2). Section 622-a states:

> The bond, letter of credit or certificate of deposit shall be payable in favor of the people of the state of New York for the benefit of any buyer injured in the event that the seller goes out of business prior to the expiration of the buyer's contract for services, or otherwise fails to provide a refund to the buyer after cancellation of the buyer's contract for services . . . .

N.Y. GEN. BUS. LAW § 622-a(4).[2]

---

[2] A health club business is not required to file a bond, letter of credit, or certificate of deposit if it charges total fees of $150 or less. N.Y. GEN. BUS. LAW § 622-a(10). It is also exempt if consumers may opt to pay their dues on a monthly basis, provided that the monthly dues are $150 or less, the contract does not provide for automatic renewal, there is adequate disclosure, and other terms, not relevant here, are satisfied. *See id.*

Here, the record shows that the Consent Judgment Debt arose in connection with an "express or technical trust," in the form of a statutory trust under Article 30. *See In re Zoldan*, 226 B.R. at 772. First, the record shows that property or money was entrusted to Core Health & Fitness, in that there are identifiable trust assets in the form of the payments made to Core Health & Fitness by consumers for their membership contracts. *See* N.Y. GEN. BUS. LAW § 622 ("All moneys received by a seller pursuant to a contract for services for use by a buyer of a health club prior to the full operation of such health club shall be placed in escrow."); RESTATEMENT (SECOND) OF TRUSTS § 32 cmt. a (1959) (a trust may arise where there is a delivery in escrow).

Second, the record shows that Article 30 imposed fiduciary duties on Core Health & Fitness. Among other obligations, Section 622 required Core Health & Fitness, as a health club business selling memberships before it was fully operational, and the Debtor, as its principal, to maintain the funds that it received from consumers in an escrow account "separate and apart from any account maintained by or for the seller's personal use or for use in the construction or operation of the health club or for the payment or benefit of employees of the seller." N.Y. GEN. BUS. LAW § 622(1). And Section 622-a required Core Health & Fitness to protect its customers from loss by filing and maintaining a bond, letter of credit, or certificate of deposit for their benefit with the Secretary of State. N.Y. GEN. BUS. LAW § 622a(1)-(4). *See Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1190 (9th Cir. 2001) ("Fiduciary relationships imposed by statute may cause the debtor to be considered a fiduciary under § 523(a)(4).").

Third, the record shows that the trust obligation created by Section 622 was not implied as a result of wrongful conduct by Core Health & Fitness. Rather, the trust was established

---

independent of any misconduct and by operation of law when Core Health & Fitness began to sell memberships and was required by law to deposit the funds that it collected from consumers in an escrow account until its health club facility was fully operational. *See* N.Y. GEN. BUS. LAW § 622(1).

Finally, this conclusion is consistent with the legislative purpose that underlies Article 30. Both the plain terms of Section 620 and the effect of Sections 621, 622, and other provisions show that the New York Legislature intended to foster ethical practices and "competition, fair dealing, and prosperity" in the health club industry, and to protect consumers from "deception and financial hardship" if they purchase services from a health club business that either fails to become fully operational or unexpectedly goes out of business. N.Y. GEN. BUS. LAW § 620(2).

For these reasons, the Court finds that the Plaintiffs have satisfied the first element of their claim under Section 523(a)(4), that the Consent Judgment Debt arose in connection with an express or technical trust.

<u>Whether the Debtor acted while in a fiduciary capacity with respect to the trust</u>

The Plaintiffs must next establish that the Debtor acted while in a fiduciary capacity with respect to the trust. Courts look to federal common law to determine the meaning of "fiduciary capacity" in the context of Section 523(a)(4). *See In re Zoldan*, 226 B.R. at 772 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934)). Under federal common law, "fiduciary capacity" refers only to "fiduciary relationships that arise from express or technical trusts." *T & D Moravits & Co. v. Munton (In re Munton)*, 352 B.R. 707, 712-13 (B.A.P. 9th Cir. 2006). Notably, courts have found that the "broad general definition of a fiduciary relationship, *i.e.*, a relationship of confidence, trust or good faith, is not relevant in the dischargeability context." *In*

*re Munton*, 352 B.R. at 713.

Here, the record shows that Article 30 imposed a panoply of duties and obligations on Core Health & Fitness, and the Debtor as its principal, including obligations giving rise to an express or technical trust in the form of a statutory trust, and fiduciary duties relating to that trust. *See* pp. 34-38, *supra*. *See also In re Hemmeter*, 242 F.3d at 1190.

As described above, the Debtor, as the principal of Core Health & Fitness, was required to deposit in an escrow account all membership fees received by him prior to the full operation of Core Health & Fitness. N.Y. GEN. BUS. LAW § 622. *See* pp. 34-36, *supra*. The Debtor was also required to keep and maintain such funds "separate and apart" from his general business or personal accounts. N.Y. GEN. BUS. LAW § 622(1). *See* pp. 34-35, *supra*. The Debtor was permitted to withdraw the escrowed funds only after one-half of the construction of the proposed health club facility was completed, and even then, he was permitted to withdraw only one-third of the escrowed funds. N.Y. GEN. BUS. LAW § 622(5). *See* p. 35, *supra*. The Debtor could not draw on the balance of the escrowed funds until the health club facility was fully operational. N.Y. GEN. BUS. LAW § 622(6). *See* p. 36, *supra*. And the Debtor was required to file with the Secretary of State and maintain a bond or other security to protect consumers against loss if the health club facility went out of business before the consumer's contract expired. N.Y. GEN. BUS. LAW § 622-a(1), (2), (4). *See* pp. 36-37, *supra*. As a result, when the Debtor, as the principal of Core Health & Fitness, received membership fee payments from consumers, he acted in a fiduciary capacity with respect to the trust established by Article 30 of the General Business Law.

For these reasons, the Court finds that the Plaintiffs have satisfied the second element of

their claim under Section 523(a)(4), that the Debtor acted while in a fiduciary capacity with respect to the trust.

*Whether the Consent Judgment Debt arose from fraud or defalcation*

Finally, the Plaintiffs must establish that the Consent Judgment Debt arose from a fraud or defalcation within the meaning of bankruptcy law. *See In re Hayes*, 183 F.3d at 169; *In re Zoldan*, 226 B.R. at 775.[3]

The term "defalcation" is not a new one. As the Second Circuit Court of Appeals has observed, "the term defalcation has appeared in every bankruptcy act since 1841. Despite its longstanding use, however, its precise meaning remains unclear." *In re Hayes*, 183 F.3d at 171. Neither the Bankruptcy Code nor its legislative history provide a definition of the boundaries of "defalcation" for purposes of Section 523(a)(4). *See In re Eberhart*, 283 B.R. at 101. This Court and others have observed that "courts have reached different conclusions as to whether conscious misconduct must be shown in order to establish that a debt arises from a defalcation for purposes of Section 523(a)(4)." *In re Duncan*, 331 B.R. at 86. *See also Samuels v. Ellenbogen (In re Ellenbogen)*, 218 B.R. 709, 711 (Bankr. S.D.N.Y. 1998) ("There is apparent conflict among the federal decisions in the interpretation of defalcation.").

The Second Circuit considered the question of the extent of misconduct required to support a finding of defalcation some seventy years ago in *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir. 1937). In *Central Hanover*, the debtor Max Herbst was a dentist

---

[3] As discussed above, the Court finds that the Plaintiffs have not established that the Debtor acted with fraudulent intent under Section 523(a)(2)(A). That determination also applies in the context of Section 523(a)(4). *See Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 171 (Bankr. D. Md. 1999) ("'Fraud' under [Section 523(a)(4)] has the same meaning as the term is used in Section 523(a)(2)(A).")

and court-appointed receiver of real property in a foreclosure action, and was awarded $5,674.54 in fees by New York Supreme Court. *Central Hanover*, 93 F.2d at 511. Without waiting for the appeal period to run or inquiring whether an appeal was in the offing, Dr. Herbst withdrew and spent the funds. *Id*. Thereafter, an appeal was filed and the receiver's fees were disallowed. *Id*. Dr. Herbst did not repay fully the $5,674.54, and judgment was entered against him for the unpaid balance. *Id*.

Writing for the court, Judge Learned Hand addressed whether the judgment debt should be discharged under Section 17(a)(4), the predecessor to Section 523(a)(4), in Dr. Herbst's subsequent bankruptcy case. Specifically, the court was asked to determine "whether [the debt] was created by the [debtor's] 'fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity.'" *Id*. In considering the meaning of defalcation, Judge Hand reasoned that "[w]hatever was the original meaning of 'defalcation,' it must here have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.'" *Id*. Judge Hand observed that defalcation in the bankruptcy context "may have included innocent defaults, so as to include fiduciaries who for any reason were short in their accounts." *Id*. Applying these concepts to the case of Dr. Herbst, Judge Hand found:

> In the case at bar the [debtor] had not been entirely innocent . . . though possibly one may acquit him of deliberate wrongdoing. A judge had awarded him the money, and prima facie he was entitled to it; but he knew, or if he did not know, he was charged with notice . . . that the order would not protect him if it were reversed; and that it might be reversed until the time to appeal had expired. He made no effort to learn from the plaintiff whether it meant to appeal, and he did not wait until it could no longer do so; he took his chances.

*Central Hanover*, 93 F.2d at 512.

Judge Hand concluded:

> We do not hold that no possible deficiency in a fiduciary's accounts is
> dischargeable; in *Re Bernard*, 87 F.2d 705, 707, we said that "the
> misappropriation must be due to a known breach of the duty, and not to mere
> negligence or mistake." Although that word probably carries a larger implication
> of misconduct than "defalcation," "defalcation" may demand some portion of
> misconduct; we will assume arguendo that it does.
>
> All we decide is that when a fiduciary takes money upon a conditional authority
> which may be revoked and knows at the time that it may, he is guilty of a
> "defalcation" though it may not be a "fraud," or an "embezzlement," or perhaps
> not even a "misappropriation."

*Id.* The Second Circuit has since observed that "Judge Hand's discussion [of defalcation]

remains the most authoritative explication of the measure of the term." *In re Hayes*, 183 F.3d at

171.

More recently, bankruptcy courts have considered what kinds of conduct constitute

defalcation by a fiduciary and have concluded that commingling, failing to account for, or

misdirecting funds may support a finding of defalcation and nondischargeability under Section

523(a)(4). For example, in *Giarrusso Building Supplies, Inc. v. Hogan (In re Hogan)*, 193 B.R.

130 (Bankr. N.D.N.Y. 1995), the debtor was paid in full by the owner of a road project but made

only a partial payment to a supplier of building materials used on the project. *In re Hogan*, 193

B.R. at 139. The court found that ""defalcation" consists of a failure to account for, or any

diversion of, trust assets, other than for payment of claims of trust beneficiaries or for other

permitted purposes,'" and concluded that "the Debtor has failed to account for the funds held in

trust by him and that [the debt at issue] derives from defalcation while acting in a fiduciary

capacity." *In re Hogan*, 193 B.R. at 138-39 (quoting *Burt Bldg. Material Corp. v. Silba (In re

Silba)*, 170 B.R. 195, 202 (Bankr. E.D.N.Y. 1994)). *See also Oklahoma Grocers Ass'n v.

Millikan (In re Millikan)*, 188 Fed. Appx. 699 (10th Cir. 2006) (deposit of money order proceeds

into debtor's corporation's general bank account, in violation of state law, constituted defalcation).

Here, as described above, the Debtor had many years of experience in the operation and ownership of a health club business. *See* pp. 12-13, *supra*. The Core Health & Fitness Business Plan cites the Debtor's "expertise in the fitness industry" and "managerial positions at other established fitness clubs." Plaintiffs' Exh. J (Core Fitness Club Incorporated Business Plan). And the Debtor testified to this experience and to his training and contacts in the health club and fitness industry. *See* October 13 Trial Tr. at 89:9-92:15; October 13 Trial Tr. at 93:16-25. *See also* pp. 12-13, *supra*.

The record also shows that the Debtor was familiar with Article 30 of the General Business Law. The Core Health & Fitness Membership Agreement includes the notice required for every "contract for services which offers the consumer the option to pay in installments" in the terms specified at Section 622-a(13), as follows:

> THIS NOTICE PROVIDES IMPORTANT INFORMATION ABOUT YOUR PAYMENT OPTIONS. You may make payment on an installment basis or in a single payment. Paying the full amount may be less expensive, but may involve financial risks to you. Read this notice carefully before making a decision. New York State Law requires certain gyms to post a bond or other financial security to protect members in the event the gym closes. This gym is exempt from this requirement since it give members the option of paying on an installment basis. [T]herefore it need not post a bond or other form of financial security. In the event that installment payments are in default, member acknowledges and agrees that all interest rates required by law and/or any other collection or additional costs, including payment if any debts will be applied. In deciding whether to make your payments on an installment basis, you should be aware that if the gym closes, although the gym will remain legally liable for a refund, you may risk losing your money if the gym is unable to meet its financial obligations to members.

Plaintiffs' Exh. H (Core Health & Fitness Membership Agreement) ¶ 22 (emphasis added).

-43-

But Core Health & Fitness was not exempt from the requirement to post a bond or other security. As described above, a health club business may be exempt from this requirement only if, among other things, it charges total fees of $150 or less, or if it offers consumers a monthly dues payment option and has no automatic renewal provision. N.Y. GEN. BUS. LAW § 622-a(10). The record shows that the Core Health & Fitness charged total annual fees of $157 to $170. *See* Joint Pre-Trial Statement at 3. And the record shows that the Core Health & Fitness Membership Agreement included an automatic renewal provision. Plaintiffs' Exh. H (Core Health & Fitness Membership Agreement).

The record shows that the Debtor, as the principal of Core Health & Fitness, collected some $142,000 in fees from consumers beginning in April 2004. October 18 Trial Tr. at 200:20-22. But the Debtor did not segregate and escrow those funds as required by the General Business Law. October 13 Trial Tr. at 112:3-6. Rather, the Debtor deposited the funds that were collected from consumers into the Core Health & Fitness Citibank Account. October 13 Trial Tr. at 112:7-9; October 18 Trial Tr. at 20:14-18. The Debtor commingled these funds with his own investment funds and funds that he received from outside investors. The Debtor acknowledged, "I put all the checks, anything I got, the investor's checks from Remy [Arias], everything went into that account, so I was using that one account." October 18 Trial Tr. at 32:13-16.

The record also shows that before the Core Health & Fitness facility opened on even a limited basis, the Debtor withdrew funds from the Citibank Account, by writing checks or using a debit card, to pay business expenses of Core Health & Fitness. For example, the Debtor used checks drawn on the Citibank Account to pay the fees of professionals who provided services to

-44-

Core Health & Fitness, including $1,500 in attorney's fees, and $12,000 in architect's fees, and to pay Core Health & Fitness staff members and instructors.[4]  The Debtor also used checks drawn on the Citibank Account to pay Core Health & Fitness marketing and advertising costs.[5]  Checks drawn on the Citibank Account were used to pay for equipment for the health club facility, including weight equipment and machines, and saunas.  October 18 Trial Tr. at 161:17-162:5; 162:6-18.[6]  And the Debtor used checks drawn on the Citibank Account to pay Core Health & Fitness construction costs including supplies, labor, demolition, and rubbish removal.[7]  Finally, the Debtor paid plumbing costs for Core Health & Fitness with a $3,000 cash withdrawal from the Citibank Account.  October 18 Trial Tr. at 176:16-177:13.

The record further shows that the Debtor wrote checks on the Citibank Account to pay some of his personal expenses.  For example, the Debtor testified that he was to be paid $500 a week by Core Health & Fitness, and that since he did not get paid every week, he "paid [his] rent that was backed up on maybe two or three times."  October 18 Trial Tr. at 35:24-38:10; 163:10-19.  On four occasions, on April 30, June 1, July 8, and July 28, 2004, the Debtor wrote a check on the Citibank Account, in the amount of $1,500, to pay his monthly rent.  Plaintiffs' Exh. N (check nos. 1009, 1047, 1091, 1112, totaling $6,100).  And the Debtor wrote a check on the

---

[4]  *See* Plaintiffs' Exh. N (check nos. 1005, 1006, 1008, 1017, 1033, 1034, 1035, 1036, 1041, 1042, 1043, 1044, 1050, 1053, 1056, 1057, 1064, 1070, 1071, 1082, 1083, 1084, 1085, 1086, 1087, 1093, 1094, 1095, 1096, 1114, 1115, 1116, 1117, 1122, 1123, totaling $29,190).

[5]  *See* Plaintiffs' Exh. N (check nos. 1004, 1014, 1018, 1020, totaling $10,661).

[6]  *See* Plaintiffs' Exh. N (check nos. 1019, 1037, 1039, 1067, totaling $26,862).

[7]  *See* Plaintiffs' Exh. N (check nos. 1010, 1023, 1026, 1027, 1028, 1030, 1031, 1040, 1045, 1049, 1051, 1060, 1066, 1068, 1069, 1072, 1076, 1077, 1078, 1081, 1092, 1097, 1107, 1109, 1118, totaling $36,387).

Citibank Account in the amount of $115 in payment of a parking ticket.  October 18 Trial Tr. at 39:1-8; Plaintiffs' Exh. N (check no. 1108).

And the record shows that the Debtor used a debit card to draw funds from the Citibank Account to pay other personal expenses, including expenses incurred for luxury items, travel, and entertainment.  For example, the Debtor used a Citibank Account debit card to purchase sunglasses for $220.48  October 13 Trial Tr. at 111:2-6.  The Debtor also used a debit card on the Citibank Account to purchase movie tickets and other theater entertainment.  October 13 Trial Tr. at 113:15-114:11; October 18 Trial Tr. at 49:12-14.  The Debtor made debit card purchases on the Citibank Account for clothing and shoes, and for services at New Village Nails.  October 18 Trial Tr. at 45:23-25; 46:21-47:2; 48:20-22.  The Citibank Account was used by the Debtor to pay for trips to San Juan, Puerto Rico, and Orlando, Florida.  October 18 Trial Tr. at 39:9-40:23; 51:6-24.  And while in Orlando, the Debtor made debit card purchases at Water Works, an amusement park, and the Latin Quarters, a club.  October 18 Trial Tr. at 51:10-24.

In sum, the record shows that the Debtor was experienced in the health club and fitness industry; that the Debtor was aware of Article 30 of the General Business Law but did not comply with its requirements to post a bond or other security and that the Core Health & Fitness Membership Agreement incorrectly stated that it was exempt from this requirement; that the Debtor collected some $142,000 in fees from consumers but did not segregate the consumers' funds or place the funds in an escrow account, in violation of Article 30; that the Debtor commingled the funds with other funds, in violation of Article 30; and that the Debtor used the consumers' funds for business and personal purposes in advance of the opening of the Core Health & Fitness facility, in violation of Article 30.

For these reasons, the Court finds that the Plaintiffs have established the third element of

their claim under Section 523(a)(4), that the Consent Judgment Debt arose from the Debtor's

defalcation.

*          *          *

Based on the entire record, the Court finds that the Plaintiffs have established, by a

preponderance of the evidence, that the Consent Judgment Debt should be excepted from

discharge under Section 523(a)(4) of the Bankruptcy Code.

**Conclusion**

For the reasons stated herein, the Court finds that the Plaintiffs have established each of

the elements of their claim that the Consent Judgment Debt is excepted from discharge under

Section 523(a)(4), which provides that a "discharge under Section 727 . . . does not discharge an

individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity,

embezzlement, or larceny."  11 U.S.C. § 534(a)(4).  Accordingly, judgment is awarded in favor

of the Plaintiffs on the Second Cause of Action of Plaintiffs' Complaint, declaring that the

Consent Judgment Debt is excepted from the Debtor's discharge.

The Plaintiffs are directed to submit an order and judgment in conformity with this

Memorandum Decision.

Dated: Brooklyn, New York
     March **23,** 2007              ***S/ Elizabeth S. Stong***
                                       ELIZABETH S. STONG
                                       UNITED STATES BANKRUPTCY JUDGE